# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TENNESSEE
### MEMPHIS DIVISION

**FILED BY** _Cg_ **D.C.**

**05 JUL 18 PM 4: 47**

THOMAS M. GOULD
CLERK, U.S. DISTRICT COURT
W/D OF TN, MEMPHIS

**UNITED STATES OF AMERICA**

-v-

**ALVIN IRWIN MOSS**

2:02CR20165-01-D

**Robert G. Chadwell, Retained**
**Defense Attorney**
**1601 One Union Square**
**600 University St.**
**Seattle, WA 98101**

---

## JUDGMENT IN A CRIMINAL CASE
### (For Offenses Committed On or After November 1, 1987)

The defendant pleaded guilty on July 14, 2005 to Count I of the Indictment pursuant to a plea agreement. The Court accepted a Joint Statement of the parties in lieu of a presentence report and proceeded to sentencing. The Joint Statement provided sufficient information for the Court to sentence the Defendant. Accordingly, the Court has adjudicated that the Defendant is guilty of the following offense(s):

| Title & Section | Nature of Offense | Date Offense Concluded | Count Number(s) |
|---|---|---|---|
| 18 U.S.C. § 1962(c) | Substantive RICO (Racketeering) | 05/08/2002 | 1 |

Pursuant to the plea agreement, counts 2 through 89 are dismissed. As part of the plea agreement, the defendant also agreed to forfeit to the United States pursuant to 18 U.S.C. § 1963 the sum of U.S. $12,000,000.00 and other funds described in the agreement in satisfaction of the forfeiture provision that was charged in the Indictment.

The defendant is sentenced as provided in the following pages of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984 and the Mandatory Victims Restitution Act of 1996

**IT IS FURTHER ORDERED** that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs and special assessments imposed by this judgment are fully paid.

Defendant's Canadian Soc. Ins. No.: 707-612-438
Defendant's Canadian Passport No.: PC356685

This document entered on the docket sheet in compliance with Rule 55 and/or 32(b) FRCrP on 7/19/05

562

Defendant's Date of Birth:        12/02/1933
Defendant's U.S. Marshal No.:     19614-076
Date of Imposition of Sentence:   July 14, 2005
Defendant's Mailing Address:      West Tennessee Detention Facility
                                  Inmate No. 19614076
                                  P.O. Box 509
                                  Mason, TN 38049


BERNICE B. DONALD
UNITED STATES DISTRICT JUDGE

July __18__, 2005

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of **60 Months**. **The Court having found that the defendant has been in continuous custody since his arrest on December 6, 2002 orders that he receive credit toward the service of this sentence for the time spent in custody from the date of his arrest on December 6, 2002 through the present date of sentencing.**

**The Court accepts the Joint Statement submitted by the United States and the defendant in lieu of a Presentence Report.  The Court recommends to the Bureau of Prisons that the defendant be designated to FDC SeaTac, Seattle, Washington.  If FDC SeaTac is not available, the Court recommends that the defendant be designated to FDC Sheridan, Sheridan, Oregon.**

**The Court recommends to the Department of Justice that any application filed by defendant pursuant to applicable treaties or conventions for transfer to Canada to serve his sentence of incarceration be granted, and that he be transferred as expeditiously as possible to a Canadian penal facility for that purpose.**

The defendant is remanded to the custody of the United States Marshal.

## FORFEITURE

The Defendant shall forfeit to the United States pursuant to 18 U.S.C. § 1963 and the terms of the Plea Agreement:

The sum of twelve million dollars in U.S. funds ($12,000,000.00) which is to be deposited into the Registry of the Court.

Any and all assets of defendant currently held by Inversiones Haas, S.A.; Servicios de Soporte al Turismo, S.A.; or by Luis-Enrique Villalobos, Osvaldo Villalobos, or Freddy Villalobos individually; or by any other company controlled by them (the "Villalobos claims") to the extent that either the defendant or the United States is able to recover those assets.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at_____, with a certified copy of this
judgment.

_____
UNITED STATES MARSHAL

By:_____
Deputy U.S. Marshal

## SUPERVISED RELEASE

**No period of supervised release imposed.**

## CRIMINAL MONETARY PENALTIES

The defendant shall pay the following total criminal monetary penalties in accordance with the schedule of payments set forth in the Schedule of Payments.  The defendant shall pay interest on any fine or restitution of more than $2,500, unless the fine or restitution is paid in full before the fifteenth day after the date of judgment, pursuant to 18 U.S.C. § 3612(f).  All of the payment options in the Schedule of Payments may be subject to penalties for default and delinquency pursuant to 18 U.S.C. § 3612(g).

| Total Assessment | Total Fine | Total Restitution |
|:---:|:---:|:---:|
| $100.00 | $0.00 | $0.00 |

The Special Assessment shall be due immediately.

### FINE

No fine imposed.

### RESTITUTION

No Restitution was ordered.

## IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF TENNESSEE
### WESTERN DIVISION

FILED IN OPEN COURT

DATE: 7-14-2005

TIME: 9:07 Am

INITIALS: T.H.

UNITED STATES OF AMERICA,          *

    Plaintiff,          *

vs.          *          Criminal No.   02-20165-D

              *

ALVIN IRWIN MOSS,          *

    Defendant.          *

---

## JOINT STATEMENT

---

The United States and Mr. Alvin Irwin Moss have negotiated a written Plea Agreement pursuant to FRCrP Rule 11(c)(1)(C), a copy of which is attached to this report. Entry of the plea is now set for July 14, 2005. One of terms of the agreement provides that the government will act to expedite Mr. Moss's transfer to the custody of the appropriate authorities in Canada to serve the remainder of his sentence. The procedures for applying for transfer pursuant to the applicable treaties and conventions are time consuming. An application for transfer under the program cannot even be made until Mr. Moss arrives at his designated facility. An application is then reviewed by officials of both governments. Further, even after a transfer has been approved, the actual transfers of prisoners between the United States and Canada only occur four times per year.

The United States has further agreed to recommend that the Court impose sentence immediately following Mr. Moss's entry of his plea of guilty. Should the Court accept this recommendation, Mr. Moss may be eligible for transfer to Canadian authorities in December of this year. If sentencing occurs in the normal course of practice, Mr. Moss's transfer will not likely earlier than until March 2006.

The parties understand the United States Probation Office, as a matter of policy, does not commence a pre-sentence investigation nor produce a pre-sentence report until a defendant has actually entered his plea of guilty. To avoid the delay associated with preparing such a report and to provide the Court with sufficient information upon which to base its decision to accept the plea and to impose sentence as recommended, the parties jointly submit the following report for use by the Court at sentencing in lieu of a pre-sentence report.

### Identifying Data

Date of Birth: 12/02/1933         Place of Birth:     Winnipeg, Manitoba

Race: Caucasian                   Sex: Male

FBI No.:                          Citizenship: Canada

U.S. Marshal No.: 19614-076            Education: High School

SSN: N/A Canadian Citizen         Dependents: None

Other ID No.: Canadian Passport #: PC356685     Codefendants: See Indictment
              Canadian Social Insurance #: 707-612-438

Current Address:    Western Tennessee Detention Facility
                    Inmate #19614076
                    PO Box
                    Mason, TN 38049

Detainers: None known

2

7/13/05

Assistant U.S. Attorneys

Dan L. Newsom
Christopher E. Cotten
Federal Building
167 N. Main Street, Suite 800
Memphis, Tennessee  38103
(901) 544-4231

Defense Counsel

Robert G. Chadwell
McKay Chadwell, PLLC
1601 One Union Square
600 University Street
Seattle, WA  98101
(206) 233-2800

## Charge(s) and Procedural History

On May 8, 2002, a federal grand jury in the Western District of Tennessee returned an Indictment against numerous defendants, including Alvin Irwin Moss, alleging a violation of the Racketeering Influenced and Corrupt Organizations (RICO) Act; a RICO conspiracy, mail fraud, unlawful importation, money laundering and forfeiture allegations.  Count 1 alleged a violation of RICO in violation of 18 U.S.C. §1962(c) and 119 individual racketeering acts; Count 2 alleged a RICO conspiracy in violation of 18 U.S.C. §1962(d); Counts 3-9, 11, and 13-72 alleged mail fraud in violation of 18 U.S.C. §1341 and 18 U.S.C. §2; Counts 10 and 12 alleged unlawful importation in violation of 18 U.S.C. §545 and 18 U.S.C. §2; Counts 73-88 alleged money laundering in violation of 18 U.S.C. §1956(a)(2)(A) [1], 18 U.S.C. §1956(a)(2)(B)(i) and 18 U.S.C. §1961(1) and 18 U.S.C. §2.  Count 89 alleged forfeiture.  The charges arose out of the  illegal sale of foreign lottery tickets to residents of the United States by World Wide Enterprises (WWE) and IDM Direct Marketing Corp (IDM), both owned and operated by Mr. Moss.  WWE was based in Vancouver, British Columbia.  IDM was

---

[1] These Courts were dismissed by the District Court, finding the extradition of Defendant Alvin Moss excluded these particular criminal violations.

3

based in Barbados.  Solicitations to potential purchasers were made through the U.S. mail and through telemarketing calls.

## Plea Agreement

A copy of the Plea Agreement has been attached to this report.  In summary, the government and Mr. Moss have agreed that Mr. Moss will enter a guilty plea to Count 1 of the indictment, a RICO violation.  The plea will be pursuant to 11(c)(1)(C) in which the parties agree that Mr. Moss will receive a sentence of five (5) years in prison, forfeit $12 million dollars, and cooperate with the government as specified in the Plea Agreement, including the dismissal of a pending appeal in Barbados.  As part of the plea agreement, the government agrees to assist in expediting Mr. Moss's request for transfer to Canada to serve his prison time, in light of Mr. Moss's poor and rapidly declining health and his many ties to Canada.  The plea agreement also states that the government promises to refrain from prosecuting Mr. Moss for any other offenses known to it at the time of the plea agreement.

## Arrest and custody

Mr. Moss was arrested on these charges in Costa Rica on December 6, 2002 pursuant to a request for extradition from the United States Attorney's Office for the Western District of Tennessee submitted to Costa Rican authorities on or about November 25, 2002.  Mr. Moss was in some form of custody in Costa Rica from December 6, 2002 to April 16, 2004, when he was extradited to the United States. Since arriving in the United States, Mr. Moss has been in continuous custody.

4

**Offense Conduct**

The government will provide a detailed statement of Mr. Moss's conduct at the time of the entry of the plea which is fully incorporated herein as the Government's Basis In Fact, but in summary Mr. Moss's conduct is set forth below.

Since at least 1992, Mr. Moss, through use of various corporations, associations and business names, created and operated a business whereby citizens of the United States were solicited to purchase foreign and domestic lottery chances. The first company that Mr. Moss formed to engage in this business was World Wide Enterprises, Ltd. (WWE), a company located in Vancouver, British Columbia, Canada. This company was later moved to Barbados, West Indies, and the name was changed to IDM Direct Marketing Corp. (IDM). Mr. Moss founded and was a director, officer, beneficial owner and true party in interest of IDM and WWE. WWE, and later IDM, conducted various aspects of the lottery operation, such as direct mail solicitation and telemarketing. Although other companies were retained by WWE/IDM to engage in these activities designed to support their efforts, Mr. Moss retained ultimate control over the lottery ticket marketing operation. Mr. Moss and the defendants primarily solicited buyers by mass mailings, originating in Canada and mailed throughout the United States. A second method was through telephone calls originating in Vancouver, British Columbia, Canada, or Freeport, Jamaica. WWE/IDM rented lists of potential customers from a variety of sources, including JAMI Marketing. Mr. Moss approved or delegated responsibility for approving direct mail solicitations before WWE/IDM mailed them to potential purchasers.

5

Each mass mailing consisted of a solicitation in the form of printed "promotional materials" relating to a particular "promotion."   A promotion involved selecting a particular lottery or lotteries, mostly foreign but some in the United States, to include in the promotion.  Over the years included in the indictment, the defendants produced and completed millions of mass mailings to U.S. Citizens.  The various promotions were designed to appear to be originating from different sources, but in fact were originating from the defendants in each case.  The promotional materials identified two ways in which solicited citizens could respond:  by dialing a "1-800" telephone number or by returning a purchase form in a self-addressed envelope that contained a promotional name and a post office box address only.  Callers to the "1-800" number could use a credit card to send money to the defendants while those responding by mail could send checks or money orders.  WWE/IDM used a number of promotional names to identify the company purportedly contacting the citizens, including International Lottery Services, International Lottery Renewal, and International Lottery Rewards Commission (ILRC).

Promotions involved various methods of solicitation.  For instance, a citizen might be told that they had won a sum of money, but that a small "fee" must be received before the winnings could be forwarded to the citizen.  Another solicitation might be in the form of an invitation to participate in a particular lottery, usually foreign.  For a certain price, the defendants represented that they would purchase lottery tickets on behalf of the person, play the numbers for the person, and if successful, any winnings would be held on "account" for the person.  Often, promotions invited the person to

participate in the lottery as a member of a "pool" of players, in which case the person would receiver his or her share of the "pool" winnings, if any.

The amounts of money being solicited from an individual person varied from promotion to promotion, ranging from $19.95 for an individual ticket to $299.00 for a number of tickets to be purchased over time.  In order to receive the solicited person's orders and payments, the defendants rented numerous post office boxes in Canada.  Orders and payments sent to the post office boxes were regularly collected and processed.  To make payment by credit card or direct bank draft, a customer would deal with the telemarketing operations. The defendants also used merchant credit card accounts in various countries, including Canada, Australia and Vanuatu to process credit card orders.  As with the mailings, telemarketing representatives used different company names for each contact so that it appeared to potential customers that the solicitations came from different sources.

The defendant caused misleading and deceptive representations or omissions of material facts in these promotions concerning the true nature of the solicitation in order to induce citizens of the United States to purchase lottery tickets.  Such misleading or false statements included representations that other customers had recently won big prizes; that lottery winnings were "tax free;" that the potential customer being solicited had already won or had been pre-selected as a likely winner; and that a psychic with a proven track record of winning would personally select winning numbers for them.  In addition, customers were not told that it was illegal to sell lottery tickets in the manner being offered.

7

When defendant's company received orders from citizens for lottery tickets, they would obtain blocks of lottery tickets for that foreign lottery from a retail outlet. The tickets themselves were not forwarded to the customer but were held by defendants.

As part of the defendant's ongoing operations, WWE/IDM purchased tickets for national lotteries of Australia, Germany, Britain, France, Japan, and U.S. domestic lotteries. WWE/IDM maintained an entity in Canada for collecting and processing orders. After Mr. Moss's operation was moved to Barbados, the Canadian entity collected the orders and payments, they would be sorted by "promotion," boxed up and sent, via FedEx, to IDM in Barbados. The payments and orders were processed in Barbados, making use of the merchant credit card accounts and various bank accounts.

In some cases, proceeds from winning lottery tickets were not forwarded to customers who had purchased the tickets but were held by the defendants, purportedly for the purpose of applying said proceeds to the purchase of future lottery tickets. After IDM ceased operations in late 1996, an effort was made to remit customer balances through Global Liquidation, a company formed for this purpose.

In addition to the methods of obtaining payments from customers and failing to pay winning lottery proceeds, the defendants used a method of operation whereby the identities of the true and beneficial owners, operators, directors and real parties in interest would be concealed. Thus, the defendants used multi-level corporate entities, fictitious persons as management figures, numerous accounts and account names and various banking facilities.

## MR. MOSS'S CRIMINAL HISTORY

Other than this case, Mr. Moss has never been arrested or charged with any criminal offense, either as a juvenile or an adult. There are no known detainers lodged against Mr. Moss.

## BIOGRAPHICAL INFORMATION

Mr. Moss was born on February 12, 1933, in Winnipeg, Manitoba, Canada, to a family of very limited means. His father, Izzy Moscovitch, had immigrated to Canada from Romania and worked his entire life as a tailor. His father died at 98. His mother, Sarah Katz Moscovitch, had immigrated to Canada from Russia and was a homemaker. She died at 87.

Mr. Moss has three siblings, all of whom are still alive, though elderly. His brother Herb Moss is 85. Herb lives in Winnipeg, Manitoba, Canada and suffers from Parkinson's disease. His sister, Seema Siegal, is 80 and lives in Lakewood, California. Mr. Moss's brother Jerry Moscovitch is 77. Jerry lives in Winnipeg, Manitoba, Canada.

Mr. Moss grew up in Winnipeg in what he referred to as the "Jewish quarter." He reported it was a somewhat rough area and described having to begin fighting for himself at a very young age. These fights were generally with other immigrant children from the Ukrainian and Polish immigrant communities in the area.

At age 6, Mr. Moss began attending elementary school at the Aberdeen School in Winnipeg. He was a member of the Cub Scouts and the Boy Scouts, but could not recall how far he progressed as a Boy Scout. In his teenage years, Mr. Moss took a job serving food at the Montefiore Club, a private club for Jewish businessmen.

9

Mr. Moss attended high school at St. John's Technical School in Winnipeg. He graduated at 19 years of age and has not received any further formal schooling.

Mr. Moss's first job out of high school was as a sales clerk at City Lumber, Ltd., 618 Dufferin Avenue, in Winnipeg. He reported he was a sales clerk and did anything and everything else that was asked of him. This was his introduction to the lumber business.

After a time, he left City Lumber and moved to Brown and Rutherford Lumber, 5 Sutherland Avenue in Winnipeg. There he continued to sell lumber and to learn the business.

While working at this job, he became engaged to Rochelle, whom he later married.

He left Winnipeg and the lumber trade to move to Vancouver, B.C. There he and his partner, Marvin Lercher, established Super Paint and Supplies, Ltd. They started the business from scratch with very little money and a lot of hard work. The business was reasonably successful for a time. At some point, Mr. Moss developed a "double hernia" and could no longer work as he had previously. He sold his half of the business to his partner for $25,000.

After moving to Vancouver, Mr. Moss married Rochelle. They had three children, Larry, (born July 21, 1963); Beverly (born July 24, 1965); and Jeff (born November 20, 1968).

After selling his interest in Super Paints, Mr. Moss bought four building lots. He built a home on each lot and sold them. Mr. Moss made a little money in this

10

occupation but at the time, land was cheap and houses were not so fancy as today.  Mr. Moss did not continue as a developer but returned to the lumber trade.

He began work with CanAM Industries, Ltd., working principally as a lumber broker.  This required him to spend much of his time on the telephone making deals. He said he sold to a number of businesses in the United States including one Puyallup, Washington that purchased wood for the making of pallets.

During this period, Mr. Moss was fascinated with the mail order business and often placed impulse orders himself.  He was eager to get involved in this business which he considered a tremendous opportunity, but he did not have a product.  He was introduced to the concept of selling British Columbia lottery tickets by mail by Ray Rudin, a friend.  His lottery business began in his home with his wife and young children being involved in the envelope stuffing operation.

After a time, the home lottery ticket sales business became sufficiently successful that he could leave the lumber brokerage business to concentrate solely on the lottery business.  His initial lottery business was World Wide Enterprises.  He later moved his business to Barbados and operated as IDM Direct Marketing, Corp.  He continued in the lottery business until his retirement in late 1996 after the execution of search warrants at IDM sites in Barbados.

Mr. Moss and his wife, Rochelle, were divorced in the early 1990's.

Mr. Moss did not serve in the military.

11

## Physical Condition

Mr. Moss is in generally poor but currently stable health.  He suffers from numerous debilitating illnesses.  Until 2002, Mr. Moss had not experienced significantly life-impairing illnesses, but suffered from a variety of ailments, and was prescribed and taking numerous medications.  Mr. Moss was diagnosed with Type II diabetes in 1989 and has taken medication for this disease since that time.  He had surgery in 1963 to repair a hernia and has also been diagnosed with gout, anemia, irritable bowel syndrome, ulcerative colitis and sciatica.

In August 2002, Mr. Moss suffered a cerebrovascular accident (stroke), resulting in severely impaired vision, lack of balance, unstable gait and associated neurological issues such as memory loss, vagueness, and occasional bouts of dementia.  He was diagnosed with temporal arteritis, which was deemed to have contributed to the stroke and for a time, he took prescribed medications daily to treat this disease.

While in custody in Costa Rica, he was hospitalized for a period of time at Cima Hospital.  Upon his arrival at West Tennessee Detention, Mr. Moss experienced weight loss, vomiting, nausea and fatigue.  Mr. Moss initially required a wheelchair for mobility.  He also demonstrated significant difficulties with short-term memory.  Thankfully, his physical and mental condition have improved.  He is now able to walk with the use of a cane but still sometimes experiences difficulty with balance.  He has been taken off some his original medications, such as prednisone and mexthotrexate which had been prescribed to treat temporal arteritis associated with his prior stoke.  He now takes insulin for his diabetes, Imodium to control diarrhea, Cardura for a prostate problem, and Zanex for anxiety.

His mental condition has also improved.  According to the medical staff at the West Tennessee Detention Facility, he does experience occasional difficulties with short-term memory but by and large his mental condition is appropriate for an individual of his age.  He is alert, responsive, and able to assist in his own care.   They uniformly view him as being competent. Mr. Moss has never taken any drugs not prescribed for him by a physician.

Respectfully submitted this _14th_ July, 2005.

McKay Chadwell, PLLC

ROBERT G. CHADWELL (#22683)
Counsel for Alvin Moss
600 University Street, Suite 1601
Seattle, WA 98101
(206) 233-2800

DAN L. NEWSOM
Senior Litigation Counsel
United States Attorney's Office
Western District of Tennessee

13

## IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF TENNESSEE
#### WESTERN DIVISION

FILED IN OPEN COURT

DATE: 7-14-2005

TIME: 9:07 Am

INITIALS: T.H.

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

  Criminal No. 02-20165-D

ALVIN IRWIN MOSS,

    Defendant.

---

### PLEA AGREEMENT

---

I, ALVIN IRWIN MOSS, understand that the United States Attorney for the Western District of Tennessee [1] and my defense counsel have entered into plea negotiations of which I am fully aware and understand.

My attorney, Robert G. Chadwell, Esq., whom I have retained to represent me, has informed me of the nature of the criminal charges against me in the above-referenced Indictment and the elements of each charge, each of which must be proved by the Government beyond a reasonable doubt before I could be found guilty as charged.

By voluntarily pleading guilty, I knowingly waive and give up my constitutional right to plead not guilty, to compel the Government to prove my guilt beyond a reasonable doubt, not to be compelled to incriminate myself, to confront and cross-examine the witnesses against me, to subpoena witnesses on my behalf, and to have a

---

[1] The term "Government" as used herein refers solely to the United States Attorney's Office for the Western District of Tennessee.

7/13/05

jury or judge determine my guilt on the evidence presented, and other constitutional rights which apply to a defendant on trial in a criminal case.

I am pleading guilty to the charges described herein because I am guilty and because it is in my best interest to do so, and not because of any threats or promises beyond those commitments made in this agreement. I have discussed sentencing with my attorney.

**I understand the plea agreement in this case to be as follows:**

I will enter a plea of guilty to Count 1 of the above-referenced Indictment, charging me with a violation of Title 18, United States Code, Section 1962(c) [Substantive RICO].

The maximum punishment for a violation of this Section is not more than twenty (20) years imprisonment, not more than $250,000.00 fine, or both, a term of not more than five (5) years supervised release, $100 special assessment, and forfeiture to the United States of (1) any interest the defendant has acquired or maintained in violation of 1962; (2) any - (A) interest in; (B) security of; (C) claim against; or (D) property or contractual right of any kind affording a source of influence over; any enterprise which the defendant has established, operated, controlled, conducted, or participated in the conduct of, in violation of section 1962. The Court in imposing sentence, shall order, in addition to any other sentence imposed pursuant to this section, that the defendant forfeit to the United States all property described in this subsection. In lieu of a fine otherwise authorized by this section, a defendant who derives profits or other proceeds from an offense may be fined not more than twice the gross profits or other proceeds.

2

7/13/05

Property subject to criminal forfeiture under this section includes - (1) real property, including things growing on, affixed to, and found in land; and (2) tangible and intangible personal property, including rights, privileges, interests, claims, and securities.

I understand that this is a Plea Agreement pursuant to Rule 11(c)(1)(C), and that there is an agreed upon sentence of imprisonment of Sixty (60) months. I understand that I will be given credit for all of the time that I have been in custody regarding this matter, specifically including the time I was in custody in the country of Costa Rica and the time I have been in custody since being returned to the United States pursuant to an extradition order. The time spent in custody in Costa Rica began on the date of my arrest on December 6, 2002 and included time spent in custody at a Costa Rica prison, in custody at Cima Hospital, and in custody under house arrest until my transfer to U.S. custody. I was transferred to the custody of the U.S. Marshal for the Western District of Tennessee on April 16, 2004 and have remained in custody until the present.

I understand that if I desire to be transferred to a Canadian penal facility for purposes of completing my term of incarceration as set forth above, the United States Attorney's Office for the Western District of Tennessee will assist me in accomplishing such Treaty Transfer Request in an expeditious manner. The Government's assistance will include (1) supporting a recommendation to the Court that I be designated to the Bureau of Prisons facility which will accomplish my prisoner transfer most quickly, (2) coordinating with the Bureau of Prisons and the U.S. Marshal's Service for expedited movement to the facility to which I am designated, (3) requesting the prompt processing of my application by the case manager, Unit Manager, and Warden at the designated facility, (4) supporting prompt consideration of my transfer application at the U.S.

Department of Justice, (5) facilitating expedited consideration of my transfer application at the International Transfers Office of the Correctional Service of Canada, and (6) facilitating my prompt transfer from U.S. custody to Canadian custody if my application is approved.

I understand that if I fulfill each and every term of this Plea Agreement, and the Court accepts the terms of this Plea Agreement, the United States, at sentencing, will move the Court to dismiss all remaining Counts of the Indictment charging me with violations of various federal criminal statutes.

I understand that the Court may accept or reject the terms of this Plea Agreement. I further understand that, if the Court rejects the terms of this Plea Agreement, I will be given the opportunity to withdraw my plea of guilty herein.

The Government agrees to recommend to the Court that sentence be imposed immediately following entry of my plea on July 14, 2005. I hereby waive any requirement of a presentence investigative report. Although I waive such report, I understand that the Court may order that a thorough presentence investigation be conducted and sentencing recommendations independent of the United States Attorney's Office be made by the preparer of the presentence report, which the Court may adopt or take into consideration, with the understanding however that this is a Rule 11(c)(1)(C) plea. In lieu of a presentence report, the Government and the defendant agree to provide the Court on or before of the entry of the plea with a Joint Statement concerning my background, relationships, health, and nature of the charges.

The Government agrees to ask the Court to recommend that I be designated to serve my sentence at FDC Sea Tac, Sea Tac Washington. If this designation is

4

unavailable for some reason, the Government agrees to ask the Court to recommend that I be designated to serve my sentence at FPC Sheridan, Oregon.

I understand and agree to the criminal forfeiture of the following property pursuant to 18 U.S.C. §1963 to be disposed of in accordance with law:

a.     The sum of Twelve Million Dollars ($12,000,000.00) in U.S. funds, such forfeiture to be partially satisfied from the assets held at Lombard Odier Darier Hentsch Private Bank Ltd. in Gibraltar (the "Gibraltar funds") and subject to the Court's repatriation order dated May 27, 2004, as amended by its order dated April 15, 2005; and all of which shall be deposited into the Registry of the United States District Court for the Western District of Tennessee. Any additional funds needed to meet the total of Twelve Million ($12,000,000.00) U.S. Dollars will likewise be deposited with the Clerk of the Court into the Registry of the Court and shall be due at the date of sentencing. These funds shall be maintained by the Clerk until all of the terms of this agreement have been met and no contingencies remain.

As noted in the preceding paragraph, the assets subject to the Court's repatriation order will be used to satisfy in part the above said Twelve Million ($12,000,000.00) U.S. Dollars. Those assets are to be deposited into the Registry of the Court, per the Court's repatriation order which is attached. The assets subject to repatriation as ordered by the Court are those in the accounts of:

ABN-AMRO BANK N.V., Gibraltar Branch
Suite 731-4 Europort
P.O. Box 100
Gibraltar

    1)  any and all accounts in the name of Crake Limited;
    2)  any other account in which Alvin Irwin Moss is a signatory party, holder, owner or beneficiary.

5



Lombard Odier Hentsch Private Bank Limited
(formerly known as The Gibraltar Private Bank Limited)

    1) Account #W 1150 in the name of the Belar Trust;
    2) Account #W 1151 in the name of the Kendal Trust;
    3) Account #W 1151 in the name of the Trevi Trust;
    4) Any other account in the name of the Belar Trust, The Trevi Trust, or

The Kendal trust, or for which Alvin Irwin Moss is a signatory party, holder, owner, or beneficiary.

    b.    In addition to the above said Twelve Million ($12,000,000.00) U.S. Dollars, any and all assets of mine currently held by Inversiones Haas, S.A.;  Servicios de Soporte al Turismo, S.A.; or by Luis-Enrique Villalobos, Osvaldo Villalobos, or Freddy Villalobos individually; or by any other company controlled by them (the "Villalobos claims") to the extent that the United States or I am able to recover those assets.

    I further agree to waive all interest in the above-described assets in any administrative or judicial forfeiture proceeding, whether criminal or civil, state or federal, inside or outside the United States.  I agree to consent to the entry of orders of forfeiture for such property prior to sentencing and waive the requirements of Federal Rules of Criminal Procedure 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment.  I acknowledge that I understand that the forfeiture of assets is part of the sentence that may be imposed in this case and I waive any failure by the court to advise me of this, pursuant to Rule 11(b)(1)(J), at the time my guilty plea is accepted.

    I further agree to waive all constitutional and statutory challenges in any manner (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this plea agreement on any grounds, including that the forfeiture

constitutes an excessive fine or punishment. I further agree to fully assist the United States in the recovery and return to the United States of the above identified forfeitable assets (the "Gibraltar funds" and the "Villalobos claim") and prevent the disbursement of any moneys. I further agree to do all that is required to effectuate the transfer of the above identified assets (the "Gibraltar funds" and the "Villalobos claim") located in Costa Rica and Gibraltar to the United States. I agree to testify truthfully in any judicial forfeiture proceeding. I acknowledge that all property covered by this agreement is subject to forfeiture as property interests I have acquired or maintained in violation of 18 U.S.C. §1962, or as substitute assets for property otherwise subject to forfeiture.

If I should fail, in any way, to fulfill completely all of the obligations under this Plea Agreement, then in such event the United States will be released from its obligations under this Plea Agreement. Thus, for example, if I do not tender the forfeiture of Twelve Million ($12,000,000.00) U.S. Dollars within the time period provided, or in the form specified, such would constitute a violation of this Agreement, and the United States would be permitted to withdraw this Plea Agreement and proceed with the prosecution against me of the criminal violations contained in the indictment in this cause. Likewise, if the United States fails in any way to fulfill completely all of its obligations under this Agreement, I will be released from any obligation under this Agreement and the case shall proceed as if this plea had not been entered.

I understand if either party to this agreement breaches this agreement and the other party exercises it's right to withdraw from the agreement, all the funds held by the Clerk of the Court shall continue to be held by the Clerk until a final resolution of the charges has occurred.

7

The deposit of these funds will not be construed as any admission of guilt or of the right of the United States to forfeit them.

I understand my sentence will not include a fine.

I further agree to cooperate fully and truthfully with the Government in this matter. As part of this cooperation, I am willing to meet with the criminal investigators and respond truthfully and completely to any and all questions or inquiries that may be put to me at any meeting. The Government agrees that it will not question me on matters relating to my children or request that I testify as to any matter relating to them. Otherwise, I agree to testify at any trial regarding any and all allegations contained within the Indictment in this cause (Indictment No. 02-20165-D W.D. TN.). I understand that my complete truthfulness and candor are express, material conditions to the undertakings of the Government set forth in this Plea Agreement.  Therefore, if the Government should ever conclude that I have knowingly withheld material information from the Government or otherwise not been completely truthful and candid, the Government may use this against me for any purpose (including sentencing) any statements made or other information provided by me during any meeting.  If the Government so concludes, it will notify me before making any use of such statements or other information.  I understand that the Government reserves the right to use any statements or information provided by me in any prosecution for false statements, obstruction of justice or perjury.

I further agree, as part of my cooperation with the Government, that I will immediately take all necessary actions to assist the United States in obtaining, as soon as possible, all records and documents that were seized on July 12, 1996, during the

7/12/05

execution of search warrants by law enforcement authorities in Barbados, W.I. These records and documents, consisting of approximately 140 banker-sized boxes which are currently located in Barbados, W.I., were seized from the headquarters and other storage facilities of IDM. My actions, as well as individuals acting at my direction to assist the Government, will include, as the authorized principal of I.D.M. Direct Marketing Corporation, the request for immediate dismissal of any action or appeal presently pending in any court in Barbados, W.I.

I agree to waive my right to appeal on the grounds set forth in Title 18, United States Code, Section 3742.

I understand that persons convicted of crimes are required to pay a mandatory assessment of $100 per felony count of conviction. I agree that payment of this assessment, in full, is due upon sentencing.

I understand that this agreement does not apply to any crimes that I may have committed (other than those specifically set forth herein), or that I may commit hereafter, including perjury.

I understand that the prosecution will be free to fully describe the nature of these offenses and the evidence in this case. I reserve the right to comment on the prosecution's description of the nature of these offenses and the evidence in this case.

I willingly stipulate that there is a sufficient factual basis to support each and every material factual allegation contained within the count of the Indictment to which I am pleading guilty.

I understand and agree that, in addition to each of the foregoing terms and obligations, this entire Plea Agreement is contingent upon the entry of a plea of guilty by

9

7/13/05

each of the following three (3) named defendants in the Indictment in this matter: LARRY CHARLES MOSS, JEFFREY ALLEN MOSS, and BEVERLY ANN MOSS. The pleas of guilty by these (3) defendants will be pursuant to separate plea agreements. Failure of any one of these three (3) defendants to enter a plea of guilty will make this entire Agreement null and void, at the unilateral election of the United States. The United States will then, if it so desires, be released from any obligation under same, and will be free to fully prosecute all charges now pending against me.

I have not been coerced, threatened, or promised anything other than the terms of this plea agreement, described above, in exchange for my plea of guilty. I understand that I will have an opportunity to personally address the Court prior to sentence being imposed.

I can read and write, and I have read and discussed the terms of the foregoing plea agreement with my attorney, Robert G. Chadwell, and am satisfied with my attorney and his advice and counsel. Being aware of all of the possible consequences of my plea, I have independently decided to enter this plea of my own free will, and am affirming that agreement on the date and by my signature below.

JULY 13/05
**DATE SIGNED**

**ALVIN IRWIN MOSS**
Defendant

July 13, 2005
**DATE SIGNED**

**ROBERT G. CHADWELL**
**Attorney for the Defendant**

10

7/13/05

**PLEA AGREEMENT - ALVIN IRVIN MOSS (continued)**

_7/14/05_
**DATE SIGNED**

**DAN L. NEWSOM**
**Senior Litigation Counsel**
**U.S. Attorney's Office**
**Western District of Tennessee**

_7/14/05_
**DATE SIGNED**

**CHRISTOPHER E. COTTEN**
**Assistant United States Attorney**
**U.S. Attorney's Office**
**Western District of Tennessee**

_7-14-05_
**DATE SIGNED**

**TERRELL L. HARRIS**
**United States Attorney**
**Western District of Tennessee**

11

UNITED STATES VS. ALVIN IRWIN MOSS
CRIMINAL NO. 02-20165-D (W.D. TN.)
COUNT 1 (Substantive RICO)
**GOVERNMENT'S BASIS IN FACT**

FILED IN OPEN COURT
DATE: 7-14-2005
TIME: 9:07 Am
INITIALS: T.H.

Had this matter proceeded to trial, the Government, through the sworn testimony of witnesses, in open court, including witnesses who worked directly with Defendant **ALVIN IRWIN MOSS**, witnesses who worked within the "enterprise", and witnesses who have been identified as victims of the fraudulent activities of the "enterprise"; and through the introduction of physical evidence, would have proven the following, as to Count 1 of the Indictment:

Defendant, **ALVIN IRWIN MOSS**, together with his other named co-defendants, with Milton Strassberg, an undicted co-conspirator, and the following unindicted corporations and associations: I D M  Direct Marketing Corp (IDM), World  Wide Enterprises, Ltd., Assertive Marketing Services, Inc., I T A Enterprises, Ltd. , Boss Communications, W C L A Enterprises, Ltd., L & M Direct Marketing, Inc., Intel Systems Pty., Ltd., Intel Systems Corp., Ltd, Intel Direct Marketing Pty., Ltd., D R M,  Ltd., Direct Response Marketing, Ltd, Maverick International, Macintosh Marketing Network, Ltd., General Telemarketing, Inc., Stron Direct Marketing Corp., Vanuatu Maritime Services Limited, European Bank, Ltd., Pacific International Trust Company Limited, Atlas Corporation, Ltd., G .F. International Group Inc., Sky Eagle Ltd., Integro Trust Company Ltd, Neale Investments Ltd, Mazeltov Investments Ltd, L B J Trust, Kosmoll Investments Limited, Universal Export Services, Inc., A C A Enterprises Ltd, Providence Marketing Corp., Armos Holdings Ltd, and others, constituted an enterprise as defined by Title 18, United States Code, Section 1961(4), namely, corporations, associations, and individuals associated in fact.

From a date unknown, but at least from in or about December, 1989, and continuously thereafter until on or about the date of the Indictment, within this District (the Western District of Tennessee), and elsewhere, Defendant, **ALVIN IRWIN MOSS**, together with his other named co-defendants, and with Milton Strassberg, all being persons employed by and associated with the enterprise, an enterprise engaged in and the activities of which affected interstate and foreign commerce, unlawfully and knowingly conducted and participated, directly and indirectly, in the conduct of the affairs of that enterprise  through a pattern of racketeering activity, that is, through the commission of acts which occurred on or about the dates as alleged for each act, and in the manner alleged for each act in Count 1 of the Indictment.

Defendant **ALVIN IRWIN MOSS** was a director, officer,  beneficial owner and true party in interest of I D M DIRECT MARKETING CORP., WORLD WIDE ENTERPRISES, LTD.,  WCLA ENTERPRISES, LTD., NEALE INVESTMENTS LTD.,  MAZELTOV INVESTMENTS LTD., and L B J TRUST and, as such, had responsibility for the direction, control, operation and management of these organizations, including the sales and

promotion of lottery tickets to citizens of the United States, nationwide, and the collection and ultimate distribution of proceeds from such sales and promotions.

Defendant **ALVIN IRWIN MOSS**, his co-defendants and their associates, through the use of the named corporations, associations, and individuals, all of whom constituted the "enterprise" would create and execute a plan and method of operation whereby citizens of the United States, nationwide, would be fraudulently induced to purchase foreign and domestic lottery chances. Among the means and methods by which the Defendant Alvin Moss, his co-defendants and their associates conducted and participated in the conduct of the affairs of the enterprise were the following:

Members of the enterprise and their associates initially established a "headquarters" in Richmond, British Columbia, Canada. This entity was called WORLD WIDE ENTERPRISES, LTD. This "headquarters" was later moved to Barbados, West Indies, and the entity name was changed to I D M DIRECT MARKETING CORP.. Members of the enterprise and their associates established telemarketing rooms - one named I T A ENTERPRISES, LTD. in Vancouver, British Columbia, Canada, and one named D R M, LTD. in Freeport, Jamaica. Solicited United States citizens would reach one of these telemarketing rooms when using the "1-800" telephone numbers contained in the "promotional materials". Various misrepresentations were made by members of the enterprise and their associates through these telemarketing rooms for the purpose of fraudulently inducing solicited United States citizens to place orders and to provide credit card information. Information received from solicited citizens was thereafter forwarded from these telemarketing rooms to Barbados by means of facsimile transmission.

Members of the enterprise and their associates established a merchant credit card account in the name of W C L A ENTERPRISES, LTD. in Canada and a merchant credit card account in the name of INTEL SYSTEMS PTY., LTD. in Australia, and later in Vanuatu. These accounts were used to process credit card payments received from solicited United States citizens.

Members of the enterprise and their associates would develop various "promotional campaigns" designed to obtain money by means of false and fraudulent pretenses, representations and promises through the sale of lottery tickets and other lottery related activities.

As part of the "promotional campaign", members of the enterprise and their associates would create and print, and cause to be created and printed, mass quantities of written promotional materials to be mailed to citizens throughout the United States. These promotional materials included two alternative methods by which the solicited citizen could respond. One method was to dial a "1-800" telephone number and the other method was to return a self-address envelope which contained a promotional name and post office box address only.

2

As part of the "promotional campaign", members of the enterprise and their associates would use numerous promotional names in the materials mass mailed to citizens throughout the United States.  These names specifically included the following: Australian Lottery Disbursement Centre (ALDC), Australian Lottery Winners Dispatch, Award Participation Selection Committee, EG/North American Lottery Disbursement Authority, International Lottery Award Services, International Lottery Entry Services, International Lottery Headquarters, International Lottery News Service, International Lottery Payout Cooperative, International Lottery Payout Services (ILPS), International Lottery Renewal, International Lottery Rewards Commission (ILRC), International Lottery Services, Joanannes Von Volant. Joint Commission American Nippon (JCAN), Lottery Win Selection Center, North American Lottery Payout Services, Payroll Collection Services, United Win Fund International, Win Selection Registry of America, and Winning Advantage Australia, Winning Advantage International.

As part of the "promotional campaign", members of the enterprise and their associates would develop and otherwise obtain mass mailing lists of United States citizens to be solicited.

As part of the "promotional campaign", members of the enterprise and their associates would establish post office box accounts at various mail receiving centers throughout Canada.  These post office boxes would be used to receive orders and payments for lottery related activities forwarded by citizens of the United States in response to the promotional materials previously received from members of the enterprise and their associates.

As part of the "promotional campaign", members of the enterprise and their associates would mail and cause to be mailed mass quantities of "promotional materials" to citizens throughout the United States.  The "promotional materials" instructed the solicited citizen to make payment by forwarding a check to members of the enterprise and their associates through the mail or by calling a "1-800" and providing credit card information.

Members of the enterprise and their associates would make and cause to be made misleading and deceptive representations and deliberately omit material facts concerning the true nature of the solicitation in order to induce citizens of the United States to send them money

Members of the enterprise and their associates, in order to induce citizens of the United States to send them money, would make, and cause to be made, various false and fraudulent pretenses, representations and promises, well knowing that these pretenses, representations, and promises would be and were false and fraudulent when made, including but not limited to the following:

3

That other customers of the defendants had recently won a big lottery prize; Defendants' promotional materials exhibited photographs and listed names of these "winners". In truth and fact, the persons pictured were not customers of the defendants.

That lottery winnings were "tax free". In truth and fact, they were tax free only with respect to the place where the lottery was held and were subject to substantial taxes for United States residents;

That the solicited citizen would receive "tested to win lottery numbers" In truth and fact, purchasers were randomly given numbers;

That the solicited citizen's name appeared on a "winner's list" In truth and fact, there had been no actual winning by the solicited citizen;

The solicited citizen was instructed to provide their credit card number purportedly for purpose of paying a fee required for the collection of their winnings. In truth and fact, the credit card number was used to initially purchase lottery tickets or to purchase additional tickets.

That a "psychic", retained by the defendants, had determined that certain numbers selected by the "psychic" would win. Further, that if these numbers failed to win and the solicited citizen did not receive at least $50,000.00 in winnings, the solicited citizen would be entitled to 2,000 free lottery tickets from the defendants. In truth and fact, there was no "psychic" as represented, and solicited citizens who participated did not receive $50,000, nor 2,000 free lottery tickets.

That a "confirmation" would be received by the solicited citizen, containing their lottery numbers. In truth and fact, in many instances the participating citizen never received the promised "confirmation" or any similar correspondence.

Members of the enterprise and their associates, in order to induce citizens of the United States to send them money, would deliberately omit, and cause to be omitted, material facts as to the true nature of the solicitation, including but not limited to the following:

Solicited citizens were not told that it was illegal to purchase lottery tickets in the fashion advertised and that lotteries would refuse to pay winnings if they learned of the true nature of the purchases;

Solicited citizens were not told that the telemarketer they were speaking with was using an alias name and not revealing his or her true identity or location.

4

Solicited citizens were not told that the tickets they paid for were merely randomly assigned without regard to any "tested to win" procedure.

Members of the enterprise and their associates, through ASSERTIVE MARKETING SERVICES, INC. in Richmond, British Columbia, Canada, would routinely retrieve from the Canadian post office boxes the orders and monies mailed by United States citizens in response to the solicitations. The mail would then be opened and sorted by promotion. Orders and money would be forwarded from Canada, by means of Federal Express, to Barbados.

Members of the enterprise and their associates would create and execute a plan and method of operation whereby the identities of the true and beneficial owners, operators, directors and real parties in interest would be concealed. Said plan and method of operation included, but was not limited to:

Use of multi-level corporate entities.
Use of nominees and fictitious persons as management figures of the corporate entities.
Limiting employees' information and knowledge as to job responsibilities of others and overall operation and management of the various corporate entities.
Use of numerous accounts, account names, and various banking facilities located in the United States and in foreign countries..
Use of name and address of various entities on mailing documents to conceal the true location of the defendants and organizations involved in the enterprise.
Use of alias names when conducting business with citizens of the United States.

Members of the enterprise and their associates, through the use of L & M DIRECT MARKETING, in Cherry Hill, New Jersey, and INTEL SYSTEMS PTY., LTD., in Queensland, Australia, would purchase certain quantities of lottery tickets from lotteries operating within the United States and in foreign countries. Tickets relating to state lotteries located within the United States were purchased in violation of state laws regulating those lotteries. All purchased lottery tickets were maintained by these entities and were not forwarded on to the citizen who purchased the tickets. Proceeds from many winning tickets were held by members of the enterprise and their associates, purportedly for the purpose of applying the proceeds to the purchase of future lottery tickets.

Because of various Cease and Desist Orders issued by the United States Postal Service, and confiscations of their lottery materials which were being illegally imported into the United States, Defendant **Alvin Irwin Moss** and other members of the enterprise utilized Federal Express Corporation, headquartered here in Memphis, Tennessee, as a

5

means of continuing their fraudulent activities. FedEx accounts were set up by various members of the enterprise and international shipments in furtherance of the unlawful activities were routinely made, many of which came through Memphis, Tennessee.

Members of the enterprise and their associates established numerous bank accounts located in the United States and in various foreign countries to facilitate the enterprise's overall operation and to conceal and disguise the nature, location, source, ownership and control of the proceeds deposited into the accounts.

Members of the enterprise and their associates, through the operation and execution of the above said plan, would utilize the operation proceeds to perpetuate their unlawful enterprise for their own ultimate gain, benefit, profit, advantage and accommodation.

Members of the enterprise and their associates would seek to obtain additional monies from United States citizens who had already participated with them by repeatedly mailing the citizen promotional materials under numerous names and locations, thereby creating the false impression that the promotions were being sponsored by different organizations.

Witnesses, named in the various Racketeering Acts of Count 1 of the Indictment, who were personally contacted through mass mailings of IDM promotional materials, some providing materials they actually received, would have testified as to specific misrepresentations made in order to induce them to participate in lottery promotions, causing them to forward payment, through the United States mails and other commercial interstate carriers, in the form of checks, money orders, and credit card charges. The names of some of these witnesses are Juanita S. Howie from the Western District of Tennessee, Arlie E. Hamric from the Western District of Tennessee, ~~Juanita Williams from the Western District of Tennessee~~, Billy H. Nash from the Western District of Tennessee, Nancy Chapman from the Western District of  Tennessee, Harold V. Rininger from the State of Ohio, Maurice Salander from the State of New York, Wanda Nash from the State of Georgia, William Lee from the State of Florida, Wallace Taffet from the State of New York, Robert B. Wharton from the State of Arizona, Betty Postlewait from the State of Michigan, Margaret Paytes from the State of Ohio, Marvis Reynolds from the State of Oregon, Warren A. Miller from the State of Texas, Irene Huot from the State of Florida, Douglas F. Avery from the State of Maine, Geneva Bailey from the State of California, Stehman H. Brubaker from the State of Delaware, JoAnn Carter from the State of California, Juanita S. Rogers from the State of Colorado, Ann M. Seager from the State of New York, Betty J. Martin from the State of Virginia, June Threlkeld from the State of California, John R. Fulkerson from the State of California, David L. Cronberger from the State of Michigan, William Franklin from the State of Arizona, Sally A. Gibbs from the State of Massachusetts, Avonelle S. Hotchkin from the State of Florida,  Lonnie Anderson from the State of Mississippi, Lorraine Phelps from the State of South Carolina, Ella Rawlinson

from the State of South Carolina, Eudosia Juanitas from the State of California, Nancy C. Aiken from the State of New York, Royce Hutchins from the State of Arkansas, Alfred Bowman from the State of Florida, Lucille Camden from the State of Indiana, Donna M. McFall from the State of Wyoming, Betty Marker from the State of Pennsylvania, Ruby R. Holmes from the State of Florida, Annie Ruth Loving from the State of Oregon, and Ernest McGill from the State of Florida.   The financial records of these victims, and other banking records would have been admitted to prove that these funds were received and processed through accounts created and otherwise utilized by various defendants, specifically including Defendant **Alvin Irwin Moss**.

Testimony of sworn witnesses and physical evidence admitted at trial would have established that Defendant **Alvin Irwin Moss** and his co-defendants, once that had obtained funds from U.S. citizens who had been fraudulently induced to forward such funds, transferred the proceeds of their unlawful activities between places inside the United States and places outside the United States for the purpose of promoting the carrying on of their unlawful activities, and for the purpose of concealing and disguising the nature, the location, the source, the ownership and the control of such funds. The Government's proof as to this conduct who have further established that it took place at the locations and during the times alleged in the various Racketeering Acts contained in Count 1 of the Indictment.

As the result of the execution of the above said scheme and artifice to defraud, thousands of citizens of the United States were induced to forward in excess of $100 million dollars to Defendant **Alvin Irwin Moss**, his co-defendants and their associates. As a result, Defendant **Alvin Irwin Moss** has an interest in at least $12 Million Dollars (US) in property constituting or derived from proceeds obtained directly or indirectly from the above said scheme and artifice to defraud.


TERRELL L. HARRIS
United States Attorney
Western District of Tennessee

By:

DAN L. NEWSOM
Senior Litigation Counsel
United States Attorney's Office
Western District of Tennessee


7

7/13/05

UNITED STATES DISTRICT COURT - WESTERN DISTRICT OF TENNESSEE



# Notice of Distribution

This notice confirms a copy of the document docketed as number 562 in case 2:02-CR-20165 was distributed by fax, mail, or direct printing on July 19, 2005 to the parties listed.

---

Dan Newsom
U.S. ATTORNEY'S OFFICE
167 N. Main St.
Ste. 800
Memphis, TN 38103

Robert G. Chadwell
MCKAY CHADWELL PLLC
600 University St.
Ste. 1601
Seattle, WA 98101

Glenn Reid
WYATT TARRANT & COMBS
P.O. Box 775000
Memphis, TN 38177--500

Richard M. Carter
MARTIN TATE MORROW & MARSTON
6410 Poplar Ave.
Ste. 1000
Memphis, TN 38119

Michael R. Koblenz
MOUND COTTON WOLLAN & GREENGRASS
One Battery Park Plaza
New York, NY 10004--148

Wade V. Davies
RITCHIE FELS & DILLARD, P.C.
606 W. Main St.
Ste. 300
Knoxville, TN 37901

David W. Kenna
MOUND COTTON WOLLAN & GREENGRASS
One Battery Park Plaza
New York, NY 10004--148

David E. Wilson
MCKAY CHADWELL, PLLC
600 University
Ste 1601
Seattle, WA 98101

Christopher E. Cotten
U.S. ATTORNEY'S OFFICE
167 N. Main St.
Ste. 800
Memphis, TN 38103

Robert W. Ritchie
RITCHIE FELS & DILLARD, P.C.
606 W. Main St.
Ste. 300
Knoxville, TN 37901

Stephen Ross Johnson
RITCHIE FELS & DILLARD, P.C.
606 W. Main St.
Ste. 300
Knoxville, TN 37901--112

Michael B. Neal
ARMSTRONG ALLEN, PLLC
80 Monroe Avenue
Ste. 700
Memphis, TN 38103--246

Kemper B. Durand
THOMASON HENDRIX HARVEY JOHNSON & MITCHELL
40 S. Main St.
Ste. 2900
Memphis, TN 38103--552

Honorable Bernice Donald
US DISTRICT COURT